## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

        Plaintiff,

v.                              **Case No. 22-CV-30096-SPM**

JERMEL D. WARE,

        Defendant.

## MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

This matter comes before the court on a Motion to Dismiss the Indictment as Violative of the Second Amendment (Doc. 27) by Defendant Jermel Ware. For the reasons set forth below, the Motion (Doc. 27) is DENIED.

BACKGROUND

On February 14, 2019, Ware plead guilty to Unlawful Possession of a Weapon by a Felon pursuant to 720 ILCS 5/24-1.1, St. Clair County, Illinois Case Number 17CF1533. Under Illinois law Unlawful Possession of a Weapon by a Felon is a felony, punishable by a term of imprisonment exceeding one year. *See* 720 ILCS 5/24-1.1(e).

On August 16, 2022, a federal grand jury returned an Indictment charging Ware with one count of Felon in Possession of a Firearm pursuant to Title 18, United States Code, Section 922(g)(1) ("§ 922(g)(1)") (Doc. 12). The Indictment alleges that Ware "knowingly possessed a firearm in and affecting commerce . . . having previously been convicted of a crime punishable by imprisonment for a term exceeding one year, and knowing that he had been convicted of such a crime." *Id.*

Section 922(g)(1) provides in pertinent part that "It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm." 18 U.S.C. § 922(g)(1).

On December 19, 2022, Ware filed the Motion (Doc. 27) that is now before this Court seeking to dismiss the Indictment (Doc. 12). Ware contends that § 922(g)(1) violates the rights guaranteed by the Second Amendment of the United States Constitution (Doc. 27).  Ware argues that in light of the United States Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) the government cannot meet its burden of proving that § 922(g)(1) "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms" (Doc. 27). On January 25, 2023, the government filed a response opposing the Motion (Doc. 32). On February 8, 2023, Ware filed a reply to the response (Doc. 37). On February 28, 2023, the Court held a hearing and heard argument regarding the merits of the Motion (Doc. 39). On March 1, 2023, the Court granted the parties leave to file supplemental briefing regarding the new authority presented by the government at the February 28, 2023, hearing (Doc. 42). Ware filed his supplemental briefing on March 13, 2023, (Doc. 43) and the government filed its supplemental briefing on March 14, 2023 (Doc. 45). On March 16, 2023, the Court granted Ware leave to file additional supplemental briefing (Doc. 47). Ware filed additional supplemental briefing on March 27, 2023 (Doc. 48). The Motion is now ripe for this Court's determination.

ANALYSIS

I.    THE SECOND AMENDMENT

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." A plain reading of this text would seem to lend itself to the notion that § 922(g)(1) is in fact violative of the Second Amendment. However, before weighing the parties' arguments and the validity of § 922(g)(1), it is first necessary to review the pertinent aspects of the *Bruen* decision as well as the *District of Columbia v. Heller*, 554 U.S. 570 (2008) decision.

In *Heller*, the Supreme Court began its analysis by setting forth that the Constitution should be interpreted according to the principle that it was written to be understood by the "normal and ordinary" meaning of the words. *See Heller*, 554 U.S. at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). This principle leads to an interpretation of the Second Amendment that contains two distinct clauses, the prefatory clause and the operative clause. *See Heller*, 554 U.S. at 577.

The prefatory clause of the Second Amendment states, "[a] well regulated Militia, being necessary to the security of a free State...." The arguments of the parties in this case are not related to the language of the prefatory clause and thus this Court will forego an exhaustive review of the jurisprudence relating to such in the interest of judicial economy.

The operative clause of the Second Amendment must however be fully addressed. In *Heller*, the Court breaks the operative clause down further into two sections, "Right of the People" and "Keep and Bear Arms." *Id.* at 579-95. The "Right of the People" was then analyzed to determine the significance of "the people." *Id.* at 579. The Court noted that "right of the people" is only used three times in the amendments, in the First Amendment, in the Fourth Amendment, and most relevant to this case, in the Second Amendment. *Id.* The usage of the term "right of the people" in each instance "unambiguously refer[s] to individual rights." *Id.* The *Heller* Court then categorizes "the people" to whom the Constitution refers as "all members of the political community" or "persons who are part of a national community or who have otherwise developed sufficient connections with this country to be considered part of the community." *Id.* at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Thus, there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581.

The second section of the operative clause, "Keep and Bear Arms," defines the substance of the right held by "the people." *Id.* The *Heller* Court first turns to what constitutes "arms" and find that "arms" were understood, near the time of the ratification of the Second Amendment, to mean any weapon or thing that could be used for either offense or defense. *See Id.* The Court specifically notes that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. Finally, the Court turns to the meaning of "keep" and "bear." *Id.* at 582-92. These

words are understood, in light of founding era history, to mean to "have" and to "carry" respectively. *See Id.* at 582-84. In sum, the operative clause of the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.

After interpreting the Second Amendment, the *Heller* Court turned to an analysis of history as it pertained to the law in question. *See Id.* at 605-36. Such an analysis is particularized to the facts of each case and the requirements of such analysis as it relates to this Court's decision are delineated in *Bruen*; thus, this Court forego a review of the historical analysis in *Heller*.

Next, in its review of Second Amendment case law, this Court turns to *Bruen*. 142 S. Ct. 2111 (2022). In analyzing the constitutional question presented, the *Bruen* Court first turned to its prior holdings in *Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010).[1] In these cases, the Court "held that the Second . . . Amendment[] protect[s] and individual right to keep and bear arms." *Bruen*, 142 S. Ct. at 2125. The Court then explains that in the years following *Heller* and *McDonald*, the Court of Appeals analyzed the Second Amendment under a two-step test. *See Bruen*, 142 S. Ct. at 2126. The first step, included an analysis to determine if "the original scope of the right based on its historical meaning." *Id.* While the second step was a balancing test of either intermediate scrutiny or strict scrutiny

---

[1] The *McDonald* decision holds that the Fourteenth Amendment extends the protections guaranteed by the Second Amendment making such protections fully applicable to the States. 561 U.S. at 767-80.

depending on "[i]f a 'core' Second Amendment right is burdened." *Id.* (quoting *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017)).

The *Bruen* Court firmly rejects a two-step framework holding that "[d]espite the popularity of this two-step approach, it is one step too many." *Bruen*, 142 S. Ct. at 2127. The Court instead adopts a single step test "rooted in the Second Amendment's text, as informed by history" under which the "government must affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* Under this framework, "the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'" *Id.* (quoting *Heller*, 554 U.S. at 627). The full standard for Second Amendment analysis is:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'

*Bruen*, 142 S. Ct at 2129-30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 (1961)).

The Court then turns to outlining the framework under which the historical tradition of firearm regulation must be analyzed. First, it notes that *Heller*, in its historical analysis, compares the right to keep and bear arms to the rights guaranteed by the First Amendment. *See Bruen*, 142 S. Ct. at 2130. Thus, a similar approach can be taken to historical analysis for the Second Amendment as is taken when analyzing

restrictions imposed on the freedom of speech and when a violation of Establishment Clause is alleged. *Id.*

Examples are then given of situations where the historical analysis may be "fairly straightforward." *Id.* at 2131.

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that could also be evidence that a modern regulation is unconstitutional.

*Id.* Thus, showing that a historical analogue need not be a "historical twin" but rather "relatively similar" and "well-established and representative historical analogue" will pass constitutional muster. *Id.* at 2132-33. Two metrics to apply in undertaking the historical analogue analysis are "how and why" the regulations burden the right to keep and bear arms. *Id.* at 2133.

The *Bruen* Court then notes that "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*" and "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 2136. A short-lived law long preceding the framing or a postenactment law must not be given undue weight. *Id.* Thus, no matter the "post-ratification adoption or acceptance" of a law that is inconsistent with the original public meaning of the Constitution, it cannot overcome or change the text. *See Id.* at 2137 (quoting *Heller*, 670 F.3d at 1274 (Kavanaugh, J., dissenting)). As the Court explains, "the scope of the protection applicable" to rights enumerated in the Bill of Rights, including the right to keep and

bear arms, "is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id*; *see e.g. Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122-25 (2011). Therefore, the history immediately preceding and at the time of the ratification of the Second Amendment, including the history "[b]etween the [Stuart] Restoration [in 1660] and the Glorious Revolution [in 1688]," defines the boundaries of the Second Amendment. *Bruen*, 142 S. Ct at 2140 (quoting *Heller*, 554 U.S. at 592) (internal quotation marks omitted).

The remainder of the *Bruen* decision then goes on to apply the interpretation principles laid out to the facts in that case. 142 S. Ct at 2140-56. Such application is not instructive to the facts of this Case; therefore, this Court will forego an extensive analysis and only highlight that the application in *Bruen* leads to the conclusion that "[t]he constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Id.* at 2156 (quoting *McDonald*, 561 U.S. at 780 (plurality opinion)).

## II.   CONSTITUTIONALITY OF 922(G)(1)

In undertaking this analysis, the Court is mindful of "the Supreme Court's entitlement to speak through its opinions as well as through its technical holdings." *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (citing *United States v. Bloom*, 149, F.3d 649, 653 (7th Cir. 1998)). And that "nothing [in the Supreme Court's] opinion should be taken to cast doubt on the longstanding prohibition on the possession of firearms by felons." *Heller*, 554 U.S. at 626. The Justices have repeatedly reiterated the position Justice Scalia first stated in *Heller*, that § 922(g)(1)

is lawful. Justice Alito wrote that *Heller* "[does] not cast doubt on such longstanding measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'" *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) (plurality opinion). Further, Justice Kavanaugh once again reiterated this stance in his *Bruen* concurrence:

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose . . . Nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . [Footnote 26: We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.

142 S. Ct. at 2162 (Kavanaugh, J., concurring). Although not technically binding, such indications of the Supreme Court's position are highly persuasive.

A.  THE SECOND AMENDMENT'S PLAIN TEXT

This Court must first determine if the plain text of the Second Amendment covers Ware's conduct. If so, "the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129-30. The government argues that Ware's conduct is not covered by the Second Amendment's plain text because he is not part of "the people" as used in the operative clause of the Second Amendment. (Doc. 32, page 7). The government contends that "the people" should only extend to law-abiding, responsible, or virtuous people and only when such people are their rights for lawful purposes.

The Constitution does not define whom "the people" refers to. However, it assuredly applies to a broader scope of individuals than the government contends here. As noted above, the *Heller* Court analyzed the meaning of "the people" and turned to other examples where similar language is employed in the Constitution to guide its interpretation. *See* 554 U.S. at 579-81. The Seventh Circuit has also adopted the approach of looking to other uses of "the people" in the Bill of Rights to guide its interpretation of the scope of "the people." *See e.g. United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015). The *Meza-Rodriguez* Court found that interpreting "the people" in the Second Amendment consistent with other uses in the Bill of Rights "has the advantage of treating identical phrasing in the same way and respecting the fact that the first ten amendments were adopted as a package." *Id.* at 670.

In looking to the other Amendments to help identify the scope of "the people," it is important to remember that the Second Amendment does not guarantee "a second-class right, subject to an entirely different body of rules than the other Bill of Right guarantees." *Heller*, 554 U.S. at 2156 (quoting *McDonald*, 561 U.S. at 780 (plurality opinion)). With this guiding principle in mind, this Court turns to the meaning of "the people" in the First[2] and Fourth Amendments,[3] particularly as it applies to felons.

---

[2] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of *the people* peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. (emphasis added).

[3] "The right of *the people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." U.S. Const. amend. IV. (emphasis added).

The Fourth Amendment incontestably applies to convicted felons. *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979). Felons "do not forfeit all constitutional protections by reason of their conviction." *Id.* The First Amendment also clearly applies to felons. *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). Felons, including those still imprisoned, "enjoy substantial religious freedom under the First . . . Amendment." *See Id.* Further, felons maintain a constitutionally protected right to vote unless a state chooses to strip them of such right. *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting). The Supreme Court found in *Heller* that "the people" as used in the First and Fourth Amendments "refers to all members of the political community, not an unspecified subset." 554 U.S. at 580. This interpretation of the First and Fourth Amendment thus leads to a presumption that "the people" refers to all Americans, including as it is used in the Second Amendment. *See Id.* at 581; *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting). Therefore, this Court finds that felons are not outside of the presumption that "the people" applies to all Americans, in the context of the First, Second, and Fourth Amendments, and thus are not categorically excluded from the protections afforded therein.

The government emphasizes that the term "law-abiding" is used 14 times in the *Bruen* decision and argues that because of the usage of "law abiding" in *Bruen* and *Heller* this Court should find the rights of the Second Amendment limited to law-abiding, responsible, or virtuous people. (Doc. 32).

However, the government's argument is not persuasive. Judicial opinions should not be read like statutes but rather considered in light of the context of the

case and as an explanation of the court's disposition. *See Lewis v. Zatecky*, 993 F.3d 994, 1003 (7th Cir. 2021). Thus, every word of a judicial opinion is not a dictate but rather part of the total picture of the underlying case. The language "law-abiding" as used in both *Heller* and *Bruen* does not alter who the Second Amendment applies to, but rather describes the individuals involved in those cases.

It is evident that Ware is within "the people" covered by the First, Second, and Fourth Amendments to the Constitution. As then Judge Barrett noted "[n]either felons nor the mentally ill are categorically excluded from our national community." *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting). Accordingly, "a person convicted of a qualifying crime does not automatically lose his right to keep and bear arms but instead becomes *eligible* to lose it." *Id.* The parties do not dispute that Ware "kept" an "arm." Thus, Ware's conduct is covered by the plain text of the Second Amendment and presumptively protected. However, due to Ware's status as a felon, he is eligible to lose his Second Amendment right should the government bear its burden of showing that § 922(g)(1) is consistent with this Nation's historical tradition of firearm regulation.

B.  This Nation's Historical Tradition of Firearm Regulation

This Court must next determine if § 922(g)(1) is consistent with this Nation's historical tradition of firearm regulation. Pursuant to *Bruen*, as outlined above, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. In determining if § 922(g)(1) is consistent with this Nation's historical tradition of firearm regulation,

the question is whether there were "relevantly similar" regulations dating back to the Founding. *Id.* at 2132 (quoting Cass R. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). Meaning that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional must." *Id.* at 2133. Thus, the government must only "identify a well-established and representative historical analogue, not a historical twin." *Id.* When assessing a historical analogue to determine if it passes "constitutional muster" a court is guided by two metrics: "how and why" the right to bear arms was burdened. *Id.*

To carry its burden, the government first argues that a report of the Pennsylvania ratifying convention shows evidence that, at the time of the founding, there was an assertion that the scope of the Second Amendment should be limited, by not allowing criminals or dangerous individuals the right to keep and bear arms. (Doc. 32, p. 12). As the government correctly noted, the Supreme Court stated that the report was "highly influential" and a "precursor" to the Second Amendment. *Heller*, 554 U.S. at 603-04. The government contends that this report coupled with the fact that many state constitutions did not afford the right to possess a firearm to those convicted of a crime, shows a historical tradition permitting categorical disqualifications from constitutional rights. (Doc. 32, p. 12).

The government's argument is misguided. It is true that the Pennsylvania ratifying convention report is a historical analogue that can be used to guide this Court's determination as to whether § 922(g)(1) is consistent with this Nation's

historical tradition of firearm regulation. *See generally* 2 Documentary Hist. 624 (Pennsylvania minority's report). However, the report shows that felons being stripped of their right to keep and bear arms was inconsistent with the Framers' intent and the regulations in place at the time of ratification. *See Id.* The fact that language dispossessing criminals of their right to keep and bear arms was expressly contemplated, and then rejected shows that such a restriction was not in line with the original public meaning of the Second Amendment. Further, state constitutions denying "persons convicted of crime" the right to be armed indicates that there may be subsets of this Nation where the historical tradition is consistent with § 922(g)(1). However, it also tends to indicate that there was no such nationwide restriction; otherwise, such provisions would have been redundant.

The government also argues that categorical disqualifications are allowable and that there is a historical practice of disarming categories of people for a multitude of reasons in this Nation. (Doc. 32, p. 12). The government points to laws banning bearing arms to spread fear or terror, laws banning classes of citizens from possessing firearms, and scholarly articles opining the scope of what a well-regulated society entails. *Id.* at 12-13.

As noted above, when interpreting the Second Amendment, such interpretation is guided by previous interpretations of similar Amendments. *See Heller*, 554 U.S. at 579-81. Therefore, this Court will look to categorical restrictions on the rights guaranteed by other Amendments in the Bill of Rights, "respecting the fact that the first ten amendments were adopted as a package" to determine if

categorical restrictions are allowable. *Meza-Rodriguez*, 798 F.3d at 670. Such an approach is consistent with Supreme Court guidance, as although the right guaranteed by the Second Amendment is not a second class right, "[l]ike most rights" it "is not unlimited." *Heller*, 554 U.S. at 626. This Court turns to the jurisprudence surrounding the First Amendment once again in determining if categorical restrictions on individual rights are permissible.

The First Amendment right to vote "is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Even with understanding how central the right to vote is to this Nation, the Supreme Court has repeatedly allowed felon disenfranchisement over the past 150 years. *See Marphy v. Ramsey*, 114 U.S. 15 (1885); *Davis v. Beason*, 133 U.S. 333 (1890); *Fincher v. Scott*, 352 F.Supp. 117 (M.D. N.C. 1972), aff'd, 411 U.S. 961 (1973); *Richardson v. Ramirez*, 418 U.S. 24 (1974). Further, the Supreme Court has "suggested in dicta that exclusion of convicted felons from the franchise violates no constitutional provision." *Richardson*, 418 U.S. at 53 (citing *Lassiter v. Northampton County Board of Elections*, 360 U.S. 45 (1959)). This indicates that categorical restrictions on felons are collateral consequences which are "a recognized and valid part of the criminal justice process." *Smith v. United States Congress*, 840 Fed.Appx. 31, 34 (7th Cir. 2021). Therefore, it is clear that "some categorical disqualifications are permissible." *See Skoien*, 614 F.3d at 641.

Next, this Court must determine if such permissible categorical bans extend to § 922(g)(1). The government argues that § 922(g)(1) is a permissible categorical ban

because this Nation's historical tradition gives the legislature discretion to disarm those not trusted to follow the law and that historic felony punishment implicitly disarmed citizens (Doc. 45). To support its argument, the government points to four instances of limitation on possession of firearms directly preceding ratification of the Constitution: in 17th Century England, in 18th Century Colonial America, during the Revolutionary War, and discussions of such during the ratification debates. For the reasons outlined above, this Court does not find discussion of firearm limitations at the ratification debates persuasive. The Court will thus limit its analysis to 17th Century England, 18th Century Colonial America, and the Revolutionary War for purposes of analyzing this Nation's historical tradition of firearm regulations.

First, English law dating back to the 1680's disarmed "Papists or reputed Papists" who did not denounce their faith. 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688). Although such laws are both repugnant and unconstitutional as both Ware and the government have indicated, they are informative of the public understanding of the bounds of the right to keep and bear arms leading up to independence. The Second Amendment right to keep and bear arms was a codification of "a right inherited from our English ancestors" and thus their original understanding can provide guidance. *See Bruen*, 142 S. Ct. at 2127-28 (quoting *Heller*, 554 U.S. at 599, 626).

Second, during colonial America laws prohibiting Catholics, Native Americans, and Blacks from possessing firearms were widely adopted. *See* Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794*, 16

Law & Hist. Rev. 567, 578-79 (1998); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020). These laws are once again both repugnant and unconstitutional. Further, they do not inform this matter as such laws aimed to categorically disarm individuals based on their unchangeable characteristics or religious affiliation rather than their actions.

However, the case of Anne Hutchison does inform this Court's analysis. The Court cannot overlook evidence of this Nation's historic tradition of firearm regulation because the Court disagrees with the regulation. Anne Hutchison was banished from colonial America and over fifty of her supporters were disarmed because of a belief that they were exempt from the law. *See* James F. Cooper, Jr., *Anne Hutchison and the "Law Rebellion" Against the Clergy*, 61 New Eng. Q. 381, 391 (1988); Edmund S. Morgan, *The Case Against Anne Hutchison*, 10 New Eng. Q. 635, 637-38, 644 (1937). Particularly informative about these regulations is the restriction on the right to be armed for "disavowal of the rule of law." Fairfax Withington & Jack Schwartz, *The Political Trial of Anne Hutchison*, 51 New Eng. Q. 226, 226 (1978). It is undoubted that felons have disavowed the rule of law through their disregard of such. Therefore, this Court finds that such regulation is distinctly similar to § 922(g)(1), as their aim is the same regardless of the means which colonial America attempted to employ to reach that aim. That is both § 922(g)(1) and the case of Anne Hutchison regulate the right to keep and bear arms for individuals who disregarded the law.

Third, during the Revolutionary War numerous laws were adopting taking the right to keep and bear arms from those who did not demonstrate their allegiance to the new American government. *See The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 1993 (1890) (1775 Conn. Law); *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776); *The Statutes at Large; Being A Collection of All the Laws of Virginia*, at 282 (1821) (1777 Va. Law). Although not as directly analogous as the case of Anne Hutchison, these laws were more widespread and disarmed a larger group of individuals. As the government argues, these laws show that legislatures were afforded the authority from the very beginning of this Nation to decide when individuals would have their right to keep and bear arms taken based upon actions that did not comport with the law. *See Range v. Att'y Gen. United States*, 53 F.4th 262, 279 (3d Cir. 2022), *reh'g en banc granted, opinion vacated sub nom. Range v. Att'y Gen. United States of Am.*, 56 F.4th 992 (3d Cir. 2023).

Fourth, the Surety Statutes discussed by the Supreme Court in *Bruen* are particularly analogous to § 922(g)(1). As the Supreme Court stated "[i]n the mid-19th century, many jurisdictions began adopting surety statutes that required certain individuals to post bond before carrying weapons in public." *Bruen*, 142 S. Ct. at 2148. Such statutes presumed a right to "carry [a firearm] that be burdened only if another could make out a specific showing of 'reasonable cause to fear an injury, or breach of the peace.'" *Id.* (quoting Mass. Rev. Stat., ch. 134 § 16 (1836)). As noted above, the Second Amendment also begins with a presumption that the individual has the right

to carry. However, § 922(g)(1) burdens this right just as the surety statutes did nearly two-hundred years ago. Over 65% of prisoners in the United States will be arrested again within three years of their release and over 80% within nine years of their release. *See* Mariel Alper, Matthew R. Durose, & Joshua Markman, *2018 Update on Prisoner Recidivism: A 9-Year Follow-up Period (2005-2014)* (May 23, 2018), https://bjs.ojp.gov/library/publications/2018-update-prisoner-recidivism-9-year-follow-period-2005-2014. Thus, felons clearly fall within a category of people who are not only reasonably believed to, but also probable to cause an injury or breach of the peace. Although surety statutes did not disarm citizens, the statutes did burden the right guaranteed by the Second Amendment in a similar fashion.

Finally, during the 18th century leading to the ratification of the Bill of Rights felons were largely subject to capital punishment. *See* 4 William Blackstone, *Commentaries on the Laws of England* \*98 (Harper ed. 1854); *Baze v. Rees*, 553 U.S. 35, 95 (2008) (Thomas, J., concurring). As multiple appellate courts have noted, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 905 (3d Cir. 2020) (quoting *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019)) (internal quotation marks omitted). This Court agrees that if someone was subject to death and forfeiture of their entire estate then such laws would have also foreclosed individuals from their right to keep and bear arms.

Therefore, although there is not a "historical twin" for § 922(g)(1), as outlined above, there is evidence that categorical bans are permissible and that individuals who have been deemed dangerous, non-law abiding, or even reasonably likely to breach the peace may have their right to keep and bear arms restricted. Further, that felons generally would have been put to death and thus foreclosed from all their constitutional rights. Thus, meeting the governments burden to show historical analogues to the current firearm regulation.

### CONCLUSION

Although felons are within "the people" as contemplated by the Second Amendment, the government has carried its burden of showing that Title 18, United States Code, Section 922(g)(1) is consistent with this Nation's historical tradition of firearm regulation. Therefore, Ware's Motion to Dismiss the Indictment as Violative of the Second Amendment (Doc. 27) is DENIED.

**IT IS SO ORDERED.**

**DATED:  May 19, 2023**

_s/ Stephen P. McGlynn_
**STEPHEN P. McGLYNN**
**U.S. District Judge**